No. 15-3181
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT


_____

ROBERICK WASHINGTON,
Plaintiff-Appellant

vs.

THE UNITIED GOVERNMENT OF WYANDOTTE COUNTY, KANSAS,
ET AL.

Defendants-Respondents

On Appeal from the United States District Court for the District of Kansas
Case No. 2:14-CV-02108-JTM


_____

BRIEF FOR APPELLANT
_____


Michael J. Gallagher
Gallagher & Kaiser, LLP
523 Grand Blvd., Ste 1D
Kansas City, MO 64106
(816-471-4500
FAX: 816-888-8480
mgallagher@gkkclaw.com

Attorneys for Appellant


ORAL RGUMENT REQUESTED

## TABLE OF CONTENTS

PRIOR OR RELATED APPEALS ................................................................1

GLOSSARY ...............................................................................................1

STATEMENT OF JURISDICTION ............................................................1

STATEMENT OF THE ISSUES .................................................................1

STATEMENT OF THE CASE ....................................................................2

STATEMENT OF THE FACTS ..................................................................4

     Facts Stipulated in the Pretrial Order .....................................................4

     The Policies and the Due Process Grievance Hearing ...........................6

     The Grievance Procedure ......................................................................21

SUMMARY OF THE ARGUMENTS ........................................................22

ARGUMENT ..............................................................................................24

     Standard of Review ...............................................................................24

     1.a  Sheriff Ash is not Entitled to Qualified Immunity ..........................26

     1.b  The Unified Government is not entitled to Summary Judgment on Washington's Fourth Amendment Claim ...............................................32

     2. Defendants Should Not be Granted Summary Judgment on Washington's Claims That His Due Process Rights Were Violated because Washington has a Property Interest in his Employment with the Unified Government ........................................................................32

     3.  Washington is Entitled to a Name Clearing Hearing .........................40

     4.  A Genuine Issue of Material Fact Remains for Trial on whether an Implied Employment Contract existed between Washington and the

Unified Government. Washington is Entitled to a Name Clearing
Hearing Washington is Entitled to a Name Clearing Hearing ...............41

STATEMENT REGARDING ORAL ARGUMENT .......................................42

CONCLUSION.............................................................................................43

CERTIFICATE OF DIGITAL SUBMISSION ..................................................43

CERTIFICATE OF COMPLIANCE................................................................43

## TABLE OF AUTHORITIES

Cases:

*Allegri v. Providence-St. Margaret Health Center*, 9 Kan. App. 2d 659, 684
P.2d 1031 (1984)...................................................................................35

*Bannister v. Board of City Comm'rs*, 829 F. Supp. 1249 (D. Kan. 1993) ........27

*Bjorklund v. Randi Miller*, 467 Fed.Appx. 758, 765, 2012 WL 724219 (10th
34Cir. 2012)(unpublished)....................................................................34

*Board of Lincoln County Commissioners* v. Nielander, 275 Kan. 257, 62
P.3d 247 (2003)....................................................................................33

*Brown v. United Methodist's Homes for the Aged*, 249 Kan. 124, 815 P.2d
72 (Kan. 1991) ........................................................................26, 34, 35

*Koopman v. Johnson County Water District*, 972 F.2d 1160 (10th Cir. 1992)...26, 34, 35

*McBeth v. Himes*, 598 F.3d 708 (10th Cir. 2010)..............................................24

*Mick v. Brewer*, 76 F.3d 1127 (10th Cir. 1996)..................................................25, 27

*Morris v. Coleman Company*, 241 Kan. 501, 738 P. 2d 841 (1987)................36

*National Treasury Employees v. Von Raab*, 489 U.S. 656 (1989)....................26, 27

ii

*Pearson v. Callahan*, 555 U.S. 223 (2009) ......................................................25

*Pueblo Neighborhood Health Cntrs., Inc. v. Losavio*, 847 F.2d 642 (10th Cir. 1988). .......................................................................................................25, 27

*Riggins v. Goodman*, 572 F.3d 1101 (10th Cir. 2009) ....................................25

*Saucier v. Katz*, 533 U.S. 194 (2001) .............................................................25

*Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602 (1989) ................26, 27

*Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136 (10th Cir., 2013) ................24


Statutes:

42 U.S.C. §1983 ...............................................................................................1

42 U.S.C. §1988 ...............................................................................................1

28 U.S.C. §1331 ...............................................................................................1

Fourteenth Amendment to the United States Constitution ...............................1

K.S.A. §19-805(d) ........................................................................................1, 3

PRIOR OR RELATED APPEALS

There are no prior or related appeals.

GLOSSARY

UG refers to Defendant/Respondent Unified Government
of Wyandotte County, Kansas

STATEMENT OF JURISDICTION

This action was brought pursuant to 42 U.S.C. 1983 and 1988,  28
U.S.C. §§ 1331, the Fourteenth Amendment to the United States
Constitution, and Kansas common-law; Applt.App. 27. Plaintiffs claims that
he was discharged from his position as an Administrative Lieutenant in
violation of his due process rights and in violation of an implied contract of
employment.   The District Court granted summary judgment for the
defendants on Juily 23, 2015.   Applt.App. 456.   A Final Judgment was
entered in the District Court disposing of all issues with respect to all parties
in the case On July 23, 2015   Applt.App. 471.

A notice of appeal was filed in the District Court on August 5, 2015.
Applt.App. 472.  Appellate jurisdiction is proper in this Court pursuant to 28
U.S.C. §1291.

STATEMENT OF THE ISSUES

1.  The trial court erred in granting summary judgment to defendants UG and Ash on Washington's Fourth Amendment Claim because genuine issues of material fact remained for trial on that claim.  Applt.App. 461-66.

> A.  The trial court erred in granting summary judgment to Ash on the grounds that Washington was employed in a "safety sensitive" position by applying the "special needs" principle to justify a warrantless random urine test of a public employee, because genuine issues of material fact remain for trial concerning whether Washington's position was in fact "safety sensitive."

> B.  The trial court erred in granting summary judgment to the UG, based on its granting of summary judgment to Ash.

2.  The trial court erred in granting summary judgment to defendants on it Washington's Due Process claim on the grounds that Washington did not have a property interest in employment to support the Due Process claim because genuine issues of material fact remained for trial as to whether Washington's interest in employment with the UG constituted a property interest protected by the United States Constitution.  Applt.App. 466-48.

3.  The trial court erred in granting summary judgment to defendants on Washington's request for a Name-Clearing Hearing on the grounds that the "pretrial order does not include a claim that a liberty interest was damaged," because the issue was clearly raised in the pleadings and Pre-Trial Order.Applt.App. 468.

4.  The trial court erred in granting summary judgment to the defendants on Washington's claim for breach of an implied contract of employment because genuine issues of material fact remain for trial on the issue of whether the UG's Human Resources Guide and Grievance Procedure, which provides for suspension as the appropriate discipline for the first drug offense, because the trial court's determined that those policies provided no fixed term of employment.  Applt.App. 469-70.

## STATEMENT OF THE CASE

Plaintiff Washington was employed for 17 years in the Sheriff's Department in Wyandotte County, Kansas, which ultimately merged with

the City of Kansas City, Kansas to form a Unified Government. Applt.App. 27. As a public employee, Washington asserted claims under 42 U.S.C. §1983 for wrongful deprivation of a property interest in his public employment because (i) the UG discharged him on the basis of a positive drug test based on a mandatory random urine sample although he was not employed in a safety sensitive position, in violation of the Fourth Amendment and the UG's Drug Policy; (ii) the UG violated his due process rights by not conducting a disciplinary due process hearing as required by the Fourteenth Amendment; (iii) the UG denied him an adequate name-clearing hearing as required by the Fourteenth Amendment; and (iv) the UG terminated his employment in violation of the implied employment contract that he would not be discharged for a first drug offense under the UG's Drug and Human Resources Policies.

The trial court granted summary judgment in favor of the defendants on all of Washington's claims on the grounds that: (i) no genuine issues of material fact remained for trial based on the UG's contention that Washington was employed in a "safety sensitive position," whick established "special needs" for the governments warrantless, random drug test; (ii) there were no genuine issues of material fact remained for trial on the issue of whether Washington had a property interest in his employment;

3

(iii) the claim for a name-clearing hearing stated in the Pretrial Order was insufficiently clear to preserve that claim for trial; and (iv) no genuine issues of material fact remained for trial with respect to whether the UG's Human Resources Guide and Grievance Procedures created and enforceable implied contract.

 STATEMENT OF THE FACTS

**Facts Stipulated in the Pretrial Order**

The plaintiff, Roberick Washington (Washington), was employed as an Administrative Lieutenant in the Wyandotte County Juvenile Detention Center. Applt.App. 27. Defendant UG of Wyandotte County/Kansas City, Kansas ("UG") is a municipality organized under the laws of Kansas. Id. Defendant Donald Ash ("Ash") was and is the elected Sheriff of Wyandotte County, Kansas. Defendant Gary Ortiz was employed by the UG as Assistant County Administrator. Applt.App. 28. Defendant Douglas G. Bach was employed by the UG as Deputy County Administrator. Id.

The UG maintained a substance abuse policy that included random drug and alcohol testing of employees in safety sensitive positions. Id. On March 7, 2012, Washington supplied a urine sample as part of the random testing program. Id. On March 15, 2012, the testing laboratory, Quest Diagnostics, reported to the medical review officer, Gregory Bono, M.D.,

4

that Washington's urine sample tested positive for cocaine metabolites.  Id.
The same day, after talking with Washington, Dr. Bono notified the
administrator of the UG's drug and alcohol testing program, Renee Ramirez,
of the positive drug test result. Id.  Ramirez in turn notified Sheriff Ash of
the positive test result.  Id.

On or about March 20, 2012, Sheriff Ash terminated Washington's
employment for violation of the UG's substance abuse policy.  Applt.App.
29.  On March 22, 2012, Washington filed a grievance of his termination
under the UG's grievance procedure.  Id.  Defendant Broadus and, in turn,
Sheriff Ash denied the grievance.  Washington appealed the denial of his
grievance to the UG's Administrator.  Id.  On April 24, 2012, a grievance
hearing was held.  Id.  Defendant Gary Ortiz presided at the grievance
hearing.  Id.  Washington was represented by an attorney, John P. Biscanin,
at the grievance hearing.  Id.

On May 8, 2012, Biscanin emailed documentation of what he
represented was a drug test on Washington's hair to Defendant Ortiz.
Applt.App. 30.  The documentation indicates that a hair test was performed
by Omega Laboratories on April 24, 2012, and that the test was negative for
cocaine metabolites.  Id.  In a memorandum to County Administrator Dennis
Hayes and Defendant Bach dated May 14, 2012, Defendant Ortiz set forth

his findings of fact and recommended that Washington's termination be upheld.  Id.  In a letter dated May 15, 2012, Defendant Bach informed Washington that his grievance was denied.  Id.

**The Policies and the Due Process Grievance Hearing**

The UG's Substance Abuse Policy lists the jobs which are safety sensitive, and Washington's job as an Administrative Lieutenant and Training Coordinatior was not listed in the Policy. Washington Dep. at 48, Applt.App. 361.  There was a difference between an Administrative Lieutenant and the Juvenile Lieutenants and, which is the position listed in the Substance Abuse Policy. Washington Dep. at 50, Applt.App. 362.  After Washington gave the urine sample, he handed it to the test coordinator and went to his office to take a phone call; he did not see that the samples were sealed. Washington Dep. at 61-62. Applt.App. 365.  After the sample was sealed, Washington initialed the strip that was attached to the sample by placing his initials on it. Washington Dep. at 63, Applt.App. 365. Washington testified that he has never used cocaine. Washington Dep. at 65. Applt.App. 366.  Washington has never used illegal drugs at any time while he worked at the Juvenile Detention Center. Washington Dep. at 65-66, Applt.App. 366.  In 17 years of employment, Washington never had a write up, was never suspended, never failed a drug test, and had no other

6

disciplinary actions of any kind. Washington Dep. at 73, Applt.App. 368.

Washington did not know there was "zero-tolerance" policy in the Sheriff's department; he assumed that suspension was the appropriate discipline for a first time offense. Washington Dep. at 124, Applt.App. 369.

Washington testified that the initials attached to the urine specimen which was allegedly Washington's urine, was not Washington's hand-writing. Washington Dep. at 140-42,Applt.App. 384-85.

The Hearing Officer in Washington's grievance hearing was Gary Ortiz, who began working for the UG in March, 2007 as an Assistant County Administrator. Ortiz Dep. at 7, Applt.App. 271.  While in his position as assistant administrator, the Human Resources Department reported to Mr. Ortiz. Ortiz Dep. at 9, Applt.App. 271.  During his employment as assistant city manager in the City of Leavenworth, Mr. Ortiz was the grievance hearing officer who was the final level of appeal with respect to employee grievances. Ortiz Dep. at 11-12, Applt.App. 272.  Mr. Ortiz is the hearing officer who made the decision to uphold the discharge of Washington. Ortiz Dep. at 12, Applt.App. 272.

During the course of his employment, Mr. Ortiz served as the hearing officer with respect to over 20 human resources grievances. Oritz Dep. at 12, Applt.App. 272.  Mr. Ortiz acted as a hearing officer approximately 10 times

during the course of his employment at the UG. Ortiz Dep. at 12-13, Applt.App. 272. Mr. Ortiz testified that he has an understanding of the meaning of due process in the context of acting as an arbiter of grievances. Ortiz Dep. at 14-15, Applt.App. 273. Mr. Ortiz testified that due process, in a nutshell, insures that and all rights are protected and respected and that fairness is given to both parties involved in the grievance. Ortiz Dep. at 15, Applt.App. 273.

Mr. Ortiz agreed that consistency is important in affording due process in the grievance procedure. Ortiz Dep. at 15, Applt.App. 273. Mr. Ortiz testified that he considers a decision that is arbitrary to be a violation of due process. Ortiz Dep. at 15, Applt.App. 273. Mr. Oritz testified that it was important in adjudicating grievances to follow written procedures in determining outcomes. Ortiz Dep. at 15, Applt.App. 273. Mr. Ortiz testified that if a public employer has a written policy which says that a certain disciplinary outcome should occur, it would be a violation of due process to ignore that written procedure and do something else. Ortiz Dep. at 18-19, Applt.App. 274.

Mr. Ortiz testified that he acted as the hearing officer in connection with disciplinary action involving positive drug tests on less than five occasions. Ortiz Dep. at 19, Applt.App. 274. Ortiz testified that, in his

experience, many employees who tested positive for drugs or alcohol were returned to work. Ortiz Dep. At 19, Applt.App. 274.

Deposition Exhibit 3 is a copy of Mr. Ortiz's grievance decision with respect to Mr. Washington, which he wrote himself. Ortiz Dep. at 23, Applt.App. 275.  The Ortiz decision [Applt.App. 293-94] found, in part:

> Roberick Washington was employed by the Unified Government as a trainer in the Wyandotte County Juvenile Detention Center as a member of the Sheriff's Department.
>
> The position is considered a safety sensitive position.
>
> Sheriff Ash has a strict code of zero tolerance for drug usage of individuals occupying safety sensitive positions.
>
> As a result of a random drug test, Roberick Washington tested positive for cocaine metabolite on 3/7/12.

Mr. Ortiz indicated that he found Mr. Washington's position to be safety sensitive because he received that information from the Human Resources Department. Ortiz Dep. at 24, Applt.App. 275.  Ortiz says he learned that Washington's position was a safety sensitive position from the Human Resources Department following the hearing. Ortiz Dep. at 24, Applt.App. 275.  Ortiz testified that he contacted the Human Resources Department initially to find out whether a random test was administered, because it would have been improper to test Washington's randomly if he were not in a safety sensitive position. Ortiz Dep. at 24-25, Applt.App. 275.  The

determination that Washington was in a safety sensitive position was made based on a phone call, and Ortiz did not look at any of the duties he performed, and did not know whether he was an administrative employee or a line employee. Ortiz Dep. at 25, Applt.App. 275.

Mr. Ortiz's finding in the grievance decision that "Sheriff Ash has a strict code of zero-tolerance for drug usage of individuals occupying safety sensitive positions" came from a conversation he had with Sheriff Ash after the hearing. Ortiz Dep. at 26, Applt.App. 276.  The question of whether Sheriff Ash had a zero-tolerance policy for drug use did not come up at all in the hearing.  Oritz Dep. at 27, Applt.App. 276.

Ortiz remembered that the attorney representing Mr. Washington at the hearing had a problem with the chain of custody issue and barcodes. Ortiz Dep. at 28-29, Applt.App. 276.  If he had known that Mr. Washington claimed the initials on the lab sample of his urine test were not his initials, it would have made a difference in his decision. Ortiz Dep. at 29-30, Applt.App. 276-77.  UG did not present evidence of Washington's initials at the hearing and in Ortiz's judgment, that would have been an important part of establishing the chain of custody. Ortiz Dep. at 30, Applt.App. 277. Washington never conceded that he used illegal drugs in the hearing. Ortiz Dep. at 31, Applt.App. 277.

Oritz Deposition Exhibit 5 [Applt.App. 259] is an email from Patrick Biscanin to Ortiz dated May 8, 2012, urging Ortiz to consider the negative test for cocaine metabolites that appeared in the hair test that Washington agreed to submit. Ortiz Dep. at 33, Applt.App. 277. The question of the negative hair test came up at the due process hearing, but Ortiz did not consider the hair test in making his determination. Ortiz Dep. at 34, Applt.App. 278. Mr. Ortiz refused to consider the results of the hair test because the process afforded by the UG did not contemplate that form of relief. Ortiz Dep. at 34, 278. The reason Mr. Ortiz did not consider the hair test was that it would have required verification outside the informal grievance hearing process in order to validate the results of the hair test. Ortiz Dep. at 34, Applt.App. 278. Ortiz understood that Mr. Biscanin was offering to provide written evidence of the negative drug test on Mr. Washington's hair, but he refused to consider it. Ortiz Dep. at 35, Applt.App. 278.

Oritz Deposition Exhibit 6 [Applt.App. 296] is an email Ortiz sent to other UG employees as to why he did not consider the drug test. Ortiz Dep. at 36, Applt.App. 278. Ortiz stated that even if Washington had presented evidence that the hair test was just as accurate, if not more accurate than the urine test, he would not have considered it because the UG policy did not

11

allow for that type of testing and he wanted to stick with the policy. Ortiz Dep. at 37, Applt.App. 278.  Mr. Ortiz testified that it was prudent practice to adhere to the drug testing done by the UG, and it would not be prudent to consider other testing. Ortiz Dep. at 38 Applt.App. 279.  Mr. Ortiz felt like Mr. Biscanin was trying to make this like a court case, and the process should be an informal procedure. Ortiz Dep. at 40, Applt.App. 279.

Mr. Ortiz was aware that Mr. Washington was a long-term employee, and a good employee, and was not aware of any problems with the performance of his duties. Ortiz Dep. at 40, Applt.App. 279.  When asked whether dealing with the long-term employee it was more important to get it right than get it done quickly, Ortiz responded that he wasn't trying to rush, but after he spoke with Sheriff Ash about the zero-tolerance policy, that was persuasive to him. Ortiz Dep. at 41, Applt.App. 279.  Notwithstanding Washington's long-term employment, Mr. Ortiz felt it just wasn't appropriate to give him a few more days to authenticate the hair test result.  Ortiz Dep. at 42, Applt.App. 280.

Ortiz believed that the Sheriff's policy should control over the UG's policies because he was told that the Sheriff had discretion over County

Administrator determinations in a human resource matter.[1] Ortiz Dep. at 44, Applt.App. 280.  Ortiz believed he did not have the authority to overturn the decision to fire Washington made by the Sheriff. Ortiz Dep. at 45, Applt.App. 281. Ortiz testified that, no matter what, he and Mr. Bach did not have the authority to say to the Sheriff "you don't have grounds for termination and your discharge was inappropriate." Ortiz Dep. at 46, Applt.App. 281.

Ortiz Deposition Exhibit 9 [Applt.App. 308-312] is the UG's Human Resources Guide regarding discipline. Ortiz Dep. at 47, Applt.App. 281. That  Human Resources Guide is part of the policy under which Mr. Ortiz conducted the due process hearing for Mr. Washington. Ortiz Dep. at 47, Applt.App. 281.  Mr. Ortiz testified that progressive discipline means there is an attempt to rectify any transgressions of an employee in a gradual manner. Ortiz Dep. at 47, Applt.App. 281.   Among the disciplinary choices

---

[1]    K.S.A. §19-805(d) provides: Any personnel action taken by the sheriff under this section shall be subject to the following: (1) Personnel policies and procedures established by the board of county commissioners for all county employees other than elected officials; (2) any pay plan established by the board of county commissioners for all county employees other than elected officials; (3) any applicable collective bargaining agreements or civil service system; and (4) the budget for the financing of the operation of the sheriff's office as approved by the board of county commissioners.  See also, **Board of Lincoln County Commissioners v. Nielander**, **275 Kan. 257, 265, 62 P.3d 247 (2003)**, for the proposition that a County Sherriff's personnel decisions are subject to the County's personnel policies.

are verbal warning, written warning, suspension and termination. Ortiz Dep. at 48, Applt.App. 281. According to the Human Resources Guide, Step C is a suspension for the infraction. Ortiz Dep. at 48, Applt.App. 281. Rule Violation 19 is the rule prohibiting possession, use, or being under the influence of intoxicants or drugs while on duty, which is the infraction the UG claimed Mr. Washington had violated. Ortiz Dep. at 48-49, Applt.App. 281. According to the UG's Human Resources Policy, the penalty for a first offense of Rule 19 is a suspension, and not a discharge. Ortiz Dep. at 49, Applt.App. 281.

The UG's Substance Abuse Policy [Applt.App. 140-176] specifically requires that all disciplinary actions be taken "in accordance with the Human Resources Guide." Policy §3(d), Applt.App. 163. The applicable Human Resources Guide [Applt.App. 188-81] expressly provides that suspension, not discharge, is the mandated disciplinary action for the first drug offense. Washington was discharged for the first offense under the Human Resources Guide. Ortiz Dep. at 49, Applt.App. 281. Considering the safety sensitive positions outlined in the policy, Mr. Ortiz said he believed Mr. Washington was in a safety sensitive position, basically a conclusion drawn from testimonies he had heard in the past on how that place operates. Ortiz Dep. at 52-53, Applt.App. 282. At the due process hearing, no evidence was

14

heard concerning Mr. Washington's job duties. Ortiz Dep. at 53, Applt.App. 282. The hearing officer did not know whether Mr. Washington was ever dispatched in an emergency situation. Ortiz Dep. at 53-54, Applt.App. 282. Ortiz conceded that not all people who test positive for drugs on a random sample should be terminated under the UG's policy. Ortiz Dep. at 56, Applt.App. 283. Looking at the list of incumbent employees who tested positive for drugs, Mr. Ortiz conceded that an employee who was in code enforcement and who drove a car all the time, was not discharged after he tested positive for drugs. Ortiz Dep. at 57, Applt.App. 283. That employee was employed in a safety sensitive position. Ortiz Dep. at 58, Applt.App. 284. The hearing officer admitted he did not know why that employee was retained, while Mr. Washington was discharged. Ortiz Dep. at 59, Applt.App. 284.

Another individual on the list who worked in public works tested positive for drugs and was given a return to work agreement. Ortiz Dep. at 59, Applt.App. 284. The UG's policy permits people to return to work if they test positive, even though they were working in safety sensitive positions. Ortiz Dep. at 59, Applt.App. 284. Another individual who worked as a police officer tested positive for drugs and was returned to work. Ortiz Dep. at 60, Applt.App. 284. A police officer carries a gun and

15

goes on patrol in the community and operates motor vehicles. Ortiz Dep. at 60, Applt.App. 284.   Ortiz, the hearing officer, said he did not know the difference between Mr. Washington's circumstances and the police department officer who was returned to work following a positive drug test. Ortiz Dep. at 60, Applt.App. 284.

In making his decision in the Washington grievance, Hearing Officer Ortiz did not consider the fact that the majority of those tested positive in random drug testing were returned to work by the UG. Ortiz Dep. at 60, Applt.App. 284.    In the period from 2009 through 2014, a total of 19 employees of the UG tested positive on a drug screen, but only seven such individuals were terminated. Applt.App. 392.

Ortiz conceded there was one policy applicable Mr. Washington, the UG Human Resources Policy, and that he did not consider any Sheriff's policy in connection with his decision. Ortiz Dep. at 60, Applt.App. 284. Hearing Officer Ortiz assumed the Sheriff, as an elected official, gets to determine the severity of the punishment of his employees. Ortiz Dep. at 60, 284.   Responding to a question about why certain individuals in safety sensitive positions are retained and others are discharged for a first offense, Ortiz responded: "I judge each case on the merits according to the case." Ortiz Dep. at 62, Applt.App. 285.  Asked "so why would one come out one

16

way and one the other," Mr. Ortiz answered: "I don't know." Ortiz Dep. at
62, Applt.App. 285.

Lieutenant Washington's Position as "Safety Sensitive."

The UG's Drug Testing Policy[Applnt.App. 140-176] lists 18 "safety
sensitive" activities which require incumbent employees to be randomly
drug tested, most of which involve driving commercial vehicles.  Applt.App.
147-48; Washington Declaration at ¶6, Applt.App. 263. The Policy
definition of "safety sensitive positions" requires that the employee perform
those activities "on a regular or frequent basis."  Washington Declaration at
¶7, Applt.App. 263 and 148.  The Policy provides:

> Safety sensitive position means a position that requires
> performance of any of the safety sensitive functions listed
> above on a regular or frequent basis, except that a position that
> requires even infrequent or occasional operation of a
> commercial motor vehicle is a safety sensitive position. A list
> of safety sensitive positions is contained in Appendix A.

Applt.App. 148.

The UG claims that Washington was engaged in three of the listed
safety sensitive activities:  (12)  Providing law enforcement; (14) Monitoring
or supervising offenders or detainees in the criminal justice system, both
juveniles and adults. . .; and (17)   First line supervision of any employee
who performs a safety sensitive function on a regular basis.  Washington
Declaration at ¶8, Applt.App. 264.   Washington did not perform any of

17

these activities "on a regular or frequent basis," and he never performed any of the safety sensitive functions listed in the Policy at all while employed in his last position as an Administrative Lieutenant. Washington Declaration at ¶9, Applt.App. 264.

The Deputy Administrator, Momoudou Njie, objected to taking a drug test because he was an administrative employee, and he was never asked again to take a drug test. Washington Declaration at ¶10, Applt.App. 264. The Administrative Lieutenants in the Sheriff's department are not considered safety sensitive employees and are not drug tested. Washington Declaration at ¶11, Applt.App. 264.

At the time of Mr. Washington's discharge, he was employed as an Administrative Lieutenant in the Sheriff's Department in the Juvenile Detention Unit. Washington Declaration at ¶2, Applt.App. 263. Washington was classified as an administrative employee, and he never performed the functions of the Juvenile Detention Officers in his role as an Administrative Lieutenant. Washington Declaration at ¶3, Applt.App. 263. Washington's primary duties were training individuals employed in the Juvenile Detention Unit. Washington Declaration at ¶3, Applt.App. 263. Washington's immediate supervisor, Terry Broadus, told Washington on

multiple occasions that she was not required to submit to drug testing because she was in administration. Washington Declaration at ¶10, 264.

The only interaction Washington ever had with Juvenile Detention Officers was, when he was working overtime, he handed out pod (subunits where juveniles are detained) assignments at the beginning of the shift. Washington Declaration at ¶13, Applt.App. 264. During those times when Washington was working overtime, he worked in his office in an area separate from the secure Detention Unit. Washington Declaration at ¶13, Applt.App. 264. Washington never had contact with juvenile residents while he was working overtime. Washington Declaration at ¶13, Applt.App. 264. Washington was the individual responsible for classifying juvenile residents, which simply meant he would review periodically the "tickets" or disciplinary write-ups on juvenile residents to determine where each individual juvenile resident should be classified in terms of oversight. Washington Declaration at ¶14, 265. Washington's only contact with the individual juvenile residents during classification was a brief encounter in his office outside the detention area, while the juvenile residents were being supervised by a Juvenile Detention Officer in Washington's presence. Washington Declaration at ¶14, Applt.App. 265. Washington merely advised the resident of his or her classification status. Id. At no time did

Washington interact individually with the resident outside the presence of the supervising Juvenile Detention Officer. Id. Washington never had individual, one-on-one, contact with any juvenile resident outside the supervision of the Juvenile Detention Officer while acting as a hearing officer. Washington Declaration at ¶15, Applt.App. 265. Washington merely listened to the juvenile's account of how he or she obtained the ticket, and made a decision with respect to the validity of the disciplinary ticket. Id.

Washington's principal job responsibilities during the last several years of his employment in the Juvenile Detention Unit consisted primarily of training. Washington Declaration at ¶16, Applt.App. 265. Washington was the individual who provided all training in the Juvenile Unit, including training new hires, retraining incumbent employees, and training all individuals on CPR techniques. Id.

Washington was also responsible for creating, managing and organizing all training materials. Washington Declaration at ¶17, Applt.App. 265. Training incumbent employees involved 3 to 4 months annually, consisting of 8 hour per day, 5 day per week training sessions. Washington Declaration at ¶18, Applt.App. 265. The incumbent training included the full range of skills training with respect to job performance as

well as training individuals with respect to human resources and employment policies and practices.  Id.

In addition, as new employees were hired, Washington conducted a one-month long training program for new hires.  Washington Declaration at ¶19, Applt.App. 265.  As the trainer on policies, Washington became quite familiar with the policies of the Sheriff and the UG with respect to human resources and employee relations.  Washington Declaration at ¶20, Applt.App. 265.  Although the defendants claim that Sheriff Ash had a "zero tolerance" policy for drug use and that any positive test for drugs meant employees would be discharged, Washington has personal knowledge that no such zero tolerance policy was ever created, written, discussed or disseminated to the employees in the Juvenile Detention Unit.  Id.

Approximately 75% of Washington's time as an Administrative Lieutenant was spent in actual training, and 15% to 20% of his time was spent preparing training materials. The other incidental aspects of his job were a very small part of his duties.  Washington Declaration at ¶21, Applt.App. 265.

The Grievance Procedure

1.      The UG established a Grievance Procedure.  Applt.App. 394-97.  The Grievance Procedure provides in part:

21

General: It is the policy of the Unified Government to provide employees with an internal procedure through which work-related complaints can be presented to management. This procedure encourages fair and equitable treatment and communication in the attempt to reconcile conflicts.

Applt.App. 394.

2.      The Grievance Procedure further provides:

The Administrator will determine whether a particular complaint may properly be heard under the Grievance Procedure. The Administrator may, by written directive, remove any matter as grievable hereunder.

Applt.App. 394.  Assistant County Administrator Douglas Bach scheduled a hearing, the final step in the grievance procedure, upon Washington's grievance, for April 24, 2012.  Applt.App. 401.

## SUMMARY OF THE ARGUMENTS

The trial court erred when it granted summary judgment to the defendants on the grounds that Washington was employed in a safety sensitive position creating special needs to justify a warrantless, random drug screen.  The trial court ignored significant and substantial evidence in the record demonstrating that Washington's position was administrative and involved no safety sensitive duties. Accordingly, genuine issues of material fact remain for trial regarding whether the warrantless, random drug screen violated the Fourth Amendment protections against unreasonable searches and seizures.

The trial court also erred when it granted summary judgment to the defendants on Washington's claim that he was denied a due process hearing following his termination because the trial court erroneously concluded that Washington had no property interest in his employment by a public entity. Accordingly, genuine issues of material fact remain for trial on Washington's due process claim.

The trial court erred when it dismissed Washington's claim for a name-clearing hearing on the grounds that Washington's counsel mistakenly asserted a property interest rather than a liberty interest as justification for the name clearing hearing. Plainly, the statement in the Pretrial Order was a typographical mistake, inconsistent with the pleadings in this case, and the court ruling deprives plaintiff of a legitimate claim which should be returned for trial.

Finally, the trial court erred when it held that Washington had no implied contract of employment with the UG. Clearly, genuine issues of material fact remain for trial, under Kansas law, concerning whether the established custom and practice of affording grievance opportunities to overcome employment discharge constitutes an implied term or provision in the employment agreement.

ARGUMENT

Standard of Review

      This Court reviews the grant of summary judgment de novo, applying the same standard that the district court should have applied. ***Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013).** Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

      In applying this standard, the Court construes the evidence in the light most favorable to the Plaintiffs as the nonmoving party. ***McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).**

      When the defendant has moved for summary judgment based on qualified immunity, the District Court still views the facts in the light most favorable to the plaintiff and resolves all factual disputes and reasonable inferences in its favor. *Id*. Unlike most affirmative defenses, however, the plaintiff will bear the ultimate burden of persuasion at trial to overcome qualified immunity by showing a violation of clearly established federal law.

Thus, at summary judgment, the District Court will grant qualified immunity unless the plaintiff can show that (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct. See *Saucier v. Katz*, **533 U.S. 194, 201-02 (2001)** (asking whether "a violation could be made out on a favorable view of the parties' submissions"), overruled in part on other grounds by *Pearson v. Callahan*, **555 U.S. 223 (2009); see also *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009)** ("[T]he Supreme Court has held that qualified immunity is proper when the record plainly demonstrates no constitutional right has been violated, or that the allegations do not offend clearly established law.").

If a "plaintiff successfully carries his two-part burden," the "defendant bears the burden, as an ordinary movant for summary judgment, of showing no material issues of fact remain that would defeat the claim of qualified immunity." *Mick v. Brewer*, **76 F.3d 1127, 1134 (10th Cir. 1996)**; see also *Pueblo Neighborhood Health Cntrs., Inc. v. Losavio*, **847 F.2d 642, 646 (10th Cir. 1988)**.

When considering whether an employee has a property interest in his public employment, the District Court should consider all of the evidence concerning the practices of the public employer in affording employees the

right to a due process hearing before termination. ***Brown v. United Methodist's Homes for the Aged*, 249 Kan. 124, 139, 815 P.2d 72, 83 (Kan. 1991);** ***Koopman v. Johnson County Water District*, 972 F.2d 1160, 1165 (10th Cir. 1992)**(ordinarily questions of intent with regard to an implied contract claim should be presented to a jury).

## LEGAL ARGUMENTS

### 1.a  Sheriff Ash is not Entitled to Qualified Immunity

Defendants asserted orrectly that a public official is entitled to qualified immunity when performing discretionary public functions, and unless the actions violate a clearly established statutory or constitutional right of which a reasonable person would have known.

The law of public employee drug testing originated with the Supreme Court's decisions in ***Skinner v. Railway Labor Executives' Assn*., 489 U.S. 602 (1989)*, and **National Treasury Employees v. Von Raab*, 489 U.S. 656 (1989)**. The Court held that the government is allowed to conduct drug tests without individualized suspicion only when there is a "special need" that outweighs the individual's privacy interest. In ***Skinner***, the Court found that public safety was such a special need. In ***Von Raab***, the Court recognized a special need in relation to customs agents who carry firearms or are directly involved in drug interdiction.

In essence, since *Skinner* and *Von Raab,* the courts have held generally that special needs exist only when a great deal of harm could be done if the job is not performed properly. Courts, generally, have not found a special needs exception for large sections of the workforce.

A job is not truly sensitive when the sensitive tasks are not a regular part of the employee's job. In *Bannister v. Board of City Comm'rs*, **829 F. Supp. 1249 (D. Kan. 1993)**, this Court struck down random testing for a secretary who delivered meals to the elderly, at most twice weekly, when volunteers failed to show up. This Court held that such incidental performance of a safety sensitive functions does not support random testing.

For 25 years, it has been abundantly clear that public employers may not insist on drug testing incumbent employees in non-safety-sensitive positions without running afoul of the Fourth Amendment. The right of a public employee who is not employed in a safety sensitive position to be free from random, suspicionless drug testing is a constitutional right which is clearly established. Accordingly, Defendant Ash is not entitled to qualified immunity on Washington's Fourth Amendment claim. *Mick v. Brewer*, **76 F.3d 1127, 1134 (10th Cir. 1996)**; *Pueblo Neighborhood Health Cntrs., Inc. v. Losavio*, **847 F.2d 642, 646 (10th Cir. 1988).**

**1.a.1. Sheriff Ash did Violate the Fourth Amendment**

The trial court found that Washington occupied a safety sensitive position simply because he worked inside the Juvenile Detention Unit.

> Here, plaintiff is employed as a supervisory lieutenant in a juvenile correction facility. The facility houses individuals who are charged with crimes, may be involved in drug activities, and may engage in violence within the facility at any time. Plaintiff's duties, even if administrative, may involve direct contact with or interdiction of illegal drugs or improvised weapons within the facility. Plaintiff performs a supervisory, and sometimes direct, role in the safety and educational development of residents. His success in the role of supervisor, trainer, and advisor depends uniquely on his judgment and ability to reason clearly.

Applt.App. 463-64.   Plainly, the trial court gave no consideration whatsoever to the abundant evidence that Washington had no unsupervised contact with those in detention in the facility. Rather, the court simply assumed that anyone who worked inside the Juvenile Detention Unit forfeits his or her right to the protections of the Fourth Amendment.

 It should be noted that this is a fact-intensive question, involving an analysis of the actual duties Washington performed and the resolution of the inconsistencies in the evidence with respect to those job functions. Virtually every "safety-sensitive" aspect of Washington's job, as argued by the defendants, is plainly refuted by conflicting and contrary evidence. defendants never provide a single, concrete example of a safety sensitive activity performed by Washington in his job as an Administrative

Lieutenant. Washington has refuted every single claim, contention, and innuendo that he performed safety sensitive functions by monitoring or supervising individuals who monitor juvenile detainees.

> The trial court also observed:
>
> The operation of "a government office, school, or prison . . . presents special needs beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements.

Applt.App. 464. Yet, it is undisputed that not all government employees working in government offices, schools or prisons are engaged in such safety-senstative activities that the warrantless, random drug testing of all such individuals is constitutional. Moreover, the record contains evidence that not all of the employees inside the Juvenile Detention Unit are subject to random testing, because they are not employed in safety sensitive positions. See, e.g. Washington Declaration ¶10, Applt.App. 264.

The trial court simply ignored conflicting evidence presented in the summary judgment record from which a reasonable trier of fact could find that Washington's position was not safety-sensitive:

- Broadus told Washington on multiple occasions that she was not required to submit to drug testing because she was in administration.

- Washington's position and his job description were not listed among the safety sensitive positions listed in the UG's Drug Testing Policy.

29

- The Policy definition of "safety sensitive positions" requires that the employee perform those activities "on a regular or frequent basis." Washington Declaration at ¶7, Applt.App. 264.

- Not only did Washington not perform any of these activities "on a regular or frequent basis," he never performed any of the safety sensitive functions listed in the Policy at all while employed in his last position as an Administrative Lieutenant.

- The administrative lieutenants in the Sheriff's department are not considered safety sensitive employees and are not drug tested.

- The only interaction Washington ever had with Juvenile Detention Officers was when he was working overtime, and the activities involved handing out pod (subunits where juveniles are detained) assignments at the beginning of the shift.

- During those times when Washington was working overtime, he worked in his office in an area separate from the secure Detention Unit.

- Washington never had contact with juvenile residents while he was working overtime.

- Washington was the individual responsible for classifying juvenile residents, which simply meant he would review periodically the

"tickets" or disciplinary write-ups on juvenile residents to determine where each individual juvenile resident should be classified in terms of oversight.

- Washington's only contact with the individual juvenile residents during classification was a brief encounter in his office outside the detention area.  While the juvenile residents were being supervised by a Juvenile Detention Officer in Washington's presence, Washington advised the resident of his or her classification status.

- At no time did Washington interact individually with the resident outside the presence of the supervising Juvenile Detention Officer.

- Washington never had individual, one-on-one, contact with any juvenile resident outside the supervision of the Juvenile Detention Officer while acting as a hearing officer.

- Washington merely listened to the juvenile's account of how he or she obtained the ticket and made a decision with respect to the validity of the disciplinary ticket.

- Washington's principal job responsibilities during the last several years of his employment in the Juvenile Detention Unit consisted primarily of training.

31

An individual may lose his Fourth Amendment protections from unreasonable searches and seizures by accepting employment in a safety sensitive position. However, it may not be argued seriously that no genuine issue of material fact exists with respect to the question of whether Washington was, in fact, employed in a safety sensitive position.

## 1.b    The Unified Government is not entitled to Summary Judgment on Washington's Fourth Amendment Claim

The trial court found that in the absence of a constitutional violation by Sheriff Ash, the UG should be granted summary judgment. Applt.App. 465-66. Of course, the problem with this finding is that genuine issues of material fact remain for trial on the question of whether UG's employees violated Washington's constitutional rights. Accordingly, summary judgment for the UG is inappropriate.

## 2.    Defendants Should Not be Granted Summary Judgment on Washington's Claims That His Due Process Rights Were Violated because Washington has a Property Interest in his Employment with the Unified Government

The trial court found that Washington was an employee-at-will and, accordingly, has no property interest in his continued employment. Applt.App. 466-68.  This finding ignores or misconstrues the specific statute

guaranteeing that employees in a county's sheriff's department have a statutory right to have employment decisions made with respect to their employment reviewed in accordance with the Uniform Government's employment practices. K.S.A. §19-805(d) provides:

> Any personnel action taken by the sheriff under this section shall be subject to the following: (1) Personnel policies and procedures established by the board of county commissioners for all county employees other than elected officials; (2) any pay plan established by the board of county commissioners for all county employees other than elected officials; (3) any applicable collective bargaining agreements or civil service system; and (4) the budget for the financing of the operation of the sheriff's office as approved by the board of county commissioners.

See also, ***Board of Lincoln County Commissioners v. Nielander*, 275 Kan. 257, 265, 62 P.3d 247 (2003)**, for the proposition that a county sherriff's personnel decisions are subject to the county's personnel policies. The trial court apparently agreed with the UG's argument that the sheriff may act autonomously with respect to discharge decisions, a proposition plainly forbidden by K.S.A. §19-805(d). The sheriff has a statutory obligation to subjugate his personnel decisions to the County's personnel policies and procedures. Accordingly, the finding that the Sheriff maintains a "zero-tolerance" policy with respect to drug offenses conflicts with K.S.A. §19-805(d). In addition, the fact that the so-called zero-tolerance policy exists

only in the Sheriff's mind, and not on paper, creates a genuine issue of material fact as to whether such a policy even exists.

When considering the issue of whether an employee has a property interest in his public employment in a motion for summary judgment, the district court should consider all of the evidence concerning the practices of the public employer in affording employees the right to a due process hearing before termination. ***Brown v. United Methodist's Homes for the Aged***, **249 Kan. 124, 139, 815 P.2d 72, 83 (Kan. 1991);** ***Koopman v. Johnson County Water District***, **972 F.2d 1160, 1165 (10th Cir. 1992)**(ordinarily questions of intent with regard to an implied contract claim should be presented to a jury).

In addition, Washington has identified significant additional evidence that the parties intended that Washington's tenure as an employee was to be governed by the written UG policies.

In an unpublished decision, in ***Bjorklund v. Randi Miller***, **467 Fed.Appx. 758, 765, 2012 WL 724219 (10th Cir. 2012)**, the Tenth Circuit recognized that an employer's own course of conduct in accepting and processing in employee's grievance demonstrates an implied agreement, raising a due process property interest in employment.  The Court noted:

> In fact, the TCPFA's own course of conduct (notifying Mr. Bjorklund that his continued employment had been called into

question, and permitting him to defend his behavior at the Board meeting) suggests it understood that Mr. Bjorklund was entitled to notice and a hearing under the Agreement prior to its determination of the existence of necessary predicate facts permitting his termination "without notice." We therefore reject Ms. Miller's argument that the "without notice" provision stripped Mr. Bjorklund of a property interest and the right to due process.

Evidence of the existence of policies giving employees grievance protections from discharge and policies establishing progressive discipline, together with other evidence that the employer intended to protect its employees from unfairness and treat employees in accordance with the rules, is sufficient to send the question of intent to the jury. ***Brown v. Methodists*, 249 Kan. 124, 138-41, supra.** See also ***Allegri v. Providence-St. Margaret Health Center*, 9 Kan. App. 2d 659, 684 P.2d 1031, 1035(1984)**(the question of whether an implied contract exists is a question of fact for the jury).

In ***Morris v. Coleman Company*, 241 Kan. 501, 738 P. 2d 841, (1987)**, the Kansas Supreme Court held that a question of fact exists for the jury on the implied contract issue where the evidence shows the employer claimed that it would treat the employees fairly and in good faith. Moreover, the Court in *Morris* held that disclaimers in the employee manual that the policies did not create a contract were not dispositive as a matter of law.  See also, ***Koopman v. Water District No. 1*, 972 F.2d 1160, 1165-66(10th Cir. 1992).**

In this case, Washington has demonstrated the existence and content of the Substance Abuse Policy, the Human Resource Guide and the Grievance Procedure, all of which create a right to grieve adverse employment decisions in a due process hearing. In addition, the following facts demonstrate the intent of the UG to follow that practice:

- In 17 years of employment, Washington never had a write up, was never suspended, never failed a drug test, and had no other disciplinary actions of any kind. Washington did not know there was "zero-tolerance" policy in the Sheriff's department; he assumed that suspension was the appropriate discipline for a first time offense.

- Mr. Ortiz is the hearing officer who made the decision to uphold the discharge of Washington.

- During the course of his employment, Mr. Ortiz served as the hearing officer with respect to over 20 human resources grievances.

- Mr. Ortiz acted as a hearing officer approximately 10 times during the course of his employment at the UG.

- Mr. Ortiz testified that he has an understanding of the meaning of due process in the context of acting as an arbiter of grievances.

- Mr. Ortiz testified that due process, in a nutshell, insures that and all rights are protected and respected and that fairness is given to both parties involved in the grievance.

- Mr. Ortiz agreed that consistency is important in affording due process in the grievance procedure.

- Mr. Ortiz testified that he considers a decision that is arbitrary to be a violation of due process.

- Mr. Oritz testified that it was important in adjudicating grievances to follow written procedures in determining outcomes.

- Mr. Ortiz testified that if a public employer has a written policy which says that a certain disciplinary outcome should occur, it would be a violation of due process to ignore that written procedure and do something else.

- Mr. Ortiz testified that he acted as the hearing officer in connection with disciplinary action involving positive drug test on less than five occasions.

- Mr. Ortiz refused to consider the results of the hair test because the process afforded by the UG did not contemplate that form of relief.

- The reason Mr. Ortiz did not consider the hair test was that it would have required verification outside the informal grievance hearing process in order to validate the results of the hair test.

- Mr. Ortiz was aware that Mr. Washington was a long-term employee, and a good employee, and was not aware of any problems with the performance of his duties.

- The UG Human Resources Guide was part of the policy under which Mr. Ortiz conducted the due process hearing for Mr. Washington.

- Mr. Ortiz testified that progressive discipline means there is an attempt to rectify any transgressions of an employee in a gradual manner.

- Among the disciplinary choices are verbal warning, written warning, suspension and termination.

- According to Human Resources Guide, Step C is a suspension for the infraction.

- Rule Violation 19 is the rule prohibiting possession, use, or being under the influence of intoxicants or drugs while on duty, which is the infraction UG claimed Mr. Washington had violated.

- According to the UG Human Resources Policy, the penalty for a first offense of Rule 19 is suspension, and not discharge.

- The Substance Abuse Policy specifically requires that all disciplinary actions be taken "in accordance with the Human Resources Guide."

- The applicable Human Resources Guide expressly provides that suspension, not discharge, is the mandated disciplinary action for the first drug offense.

- Ortiz concedes that not all people who test positive for drugs on a random sample should be terminated under the UG's policy.

- Ortiz concedes there was one policy applicable Mr. Washington, the UG Human Resources policy, and that he did not consider any Sheriff's policy in connection with his decision.

- The Grievance Procedure provides in part:

  o General: It is the policy of the Unified Government to provide employees with an internal procedure through which work-related complaints can be presented to management. This procedure encourages fair and equitable treatment and communication in the attempt to reconcile conflicts.

- The Grievance Procedure further provides:

    The Administrator will determine whether a particular complaint may properly be heard under the Grievance Procedure. The Administrator may, by written directive, remove any matter as grievable hereunder.

- Assistant County Administrator Douglas Bach scheduled a hearing, the final step in the grievance procedure, upon Washington's

39

grievance, and accordingly, the UG conceded that Washington had a
due process right to a grievance hearing under the UG's Grievance
Procedures and Disciplinary Manual.

Based on the foregoing, the trial court's finding that Washington did
not have a property interest in his job simply may not be resolved on
summary judgment.

### 3.     Washington is Entitled to a Name Clearing Hearing

Without question, Washington has a liberty interest in protection
against any disclosures with respect to defamatory, scurrilous or offensive
information disseminated from the UG, which may affect his future
employment opportunities.   Instead, the trial court found Washington's
contentions in the Pretrial Order was insufficient to raise the issue and
regarded the claim for a name-clearing hearing as abandoned.   Applt.App.
468. Under the section of the Pretrial Order identifying plaintiff's claims, the
Order provided, in part:

> Name Clearing Hearing (Count II). Washington is entitled to a
> nameclearing hearing, because his property interest in employment
> was damaged by all Defendants actions making wrongful accusation
> of drug use, pursuant to 42 U.S.C. §1983.

Applt.App. 41.  The Petition correctly identified that it was a deprivation of
a liberty interest which justified the request for a name-clearing hearing.  See
Complaint ¶33, Applt.App. 14.  Plainly, the plaintiff's liberty interest is the

grounds supporting the request for a name clearing hearing, and the refusal of the trial court to consider the request because of an apparent dictation error—not a change in the claim—is inconsistent with the responsibility of the trial court to adjudicate all cases and controversies raised in the litigation.

**4.     A Genuine Issue of Material Fact Remains for Trial on whether an Implied Employment Contract existed between Washington and the Unified Government.**

There is no point in burdening the record with a rehash of the arguments regarding the question of whether summary judgment is appropriate on the implied contract issue.  See Argument in §2. *supra*.

Curiously, with regard to the consistency of the practice of recognizing due process rights through the grievance machinery, the trial court observed:

> Finally, the UG's course of conduct does not guarantee suspension for a first positive drug test. Seven out of nineteen total positive drug tests between 2009 and 2014 resulted in either dismissal or resignation in lieu of dismissal.

Applt.App. 470.   See also Washington Exhibit 3, Applt.App. 329.   This observation had nothing to do with the UG's course of conduct in permitting disciplined or discharged employees to afford themselves of a due process hearing. Indeed, this evidence does not show the lack of enforcement of the

UG's Human Resources Guide and Grievance Policy in terminations from the Sheriff's department or any other department. There is simply no evidence that any of the dismissals for a first drug offense were upheld in the UG's well-established grievance process. As far as the record developed on summary judgment is concerned, there is no reason to conclude that any of the individuals ultimately terminated for drug offenses even grieved their termination.

Whether an implied contract exists is a question of fact for the jury, and Washington has offered ample evidence, in addition to the existence of the employment policies and other manuals, to demonstrate that the UG has recognized the right of employees to access the grievance procedure established in the policies to contest discharges.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument in this appeal. With the number, complexity and novelty of the issues involved, oral argument would help materially advance this appeal by providing this Court with the opportunity to focus and clarify the issues that concern it the most. Both sides are represented by experienced counsel who can assist the Court in resolving issues that will likely have an impact beyond the parties to this controversy

CONCLUSION

For the foregoing reasons, Appellant Washington respectfully requests that the Memorandum and Order and Judgment of the trial court, granting defendants summary judgment of all of Appellant's claims, be reversed and remanded with instructions to commence a jury trial on the issues raised by Washington.

/s/Michael J. Gallagher
Michael J. Gallagher        #70617
Gallagher & Kaiser, LLP
523 Grand Blvd., Suite 1D
Kansas City, MO 64106
(816) 471-4500
(FAX)        816-888-8480
mgallagher@gkkclaw.com

Attorneys for Plaintiff/Appellant
Roberick Washington

CERTIFICATE OF DIGITAL SUBMISSION

I certify that the digital version of the foregoing is an exact copy of what has been submitted to the Court in written form and served on counsel of record. All privacy redactions have been made. The digital submission has been scanned with the most recent version of Norton Virus Scanning Software, according to which scan is virus free.

/s/ Michael J. Gallagher

CERTIFICATE OF COMPLIANCE

43

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).   Excluding the table of contents, table of authorities and statement regarding oral argument, as directed by Rule 32(a)(7)(B)(iii), I certify to the best of my belief and knowledge that this brief contains 9,069words as calculated by Microsoft Word (2010).   This brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font, size 14.


I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

*/s/ Michael J. Gallagher*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has filed the foregoing Brief for the Appellant with the Court's ECF filing system, which automatically serves and electronic copy on Henry E. Couchman Jr., Unified Government of Wyandotte County/Kansas City, Kansas, Legal Department, Municipal Office Building, 701 N. 7th Street, Suite 961, Kansas City, KS 66101, counsel for Defendants/Respondents.


*/s/ Michael J. Gallagher*

APPENDIX TO
BRIEF FOR APPELLANT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ROBERICK WASHINGTON,

        Plaintiff,

v.                                    Case No. 14-2108-JTM

UNIFIED GOVERNMENT OF
WYANDOTTE COUNTY, KANSAS, et al.,

        Defendant.


**MEMORANDUM AND ORDER**

This action arises out of plaintiff Roberick Washington's termination as an employee of the Wyandotte County Juvenile Detention Center ("JDC") in Kansas City, Kansas. Plaintiff was fired after testing positive for cocaine in a random urine drug test. He brought this suit against defendants Unified Government of Wyandotte County/Kansas City, Kansas ("the UG"); Wyandotte County Sheriff Donald Ash; Terri Broadus, administrator of the JDC; Gary Ortiz, UG Assistant County Administrator; and Douglas G. Bach, UG Deputy County Administrator. Plaintiff brings claims under 42 U.S.C. § 1983 for an unlawful search, due process violations, entitlement to a name-clearing hearing, and breach of an implied employment contract. Defendants Ash, Broadus, Ortiz, and Bach assert a qualified immunity defense. Before the court is defendants' Motion for Summary Judgment (Dkt. 35) on all claims. As discussed below, the motion is granted.

## I. Uncontroverted Facts

The UG Sheriff's Department employed plaintiff as a lieutenant at the JDC, which houses up to 48 juveniles, both male and female, from ages 10 to 17. The JDC residents are juvenile offenders facing criminal charges. Many have a history of substance abuse and some are gang members. It is a secure facility; entrances and exits are controlled by staff at all times. The JDC also serves as a school and child development center for residents. Residents are supervised by juvenile detention officers, who are in turn supervised by sergeants and lieutenants. Officers are responsible for ensuring residents' safety, security, and care. They have significant contact with residents daily, and their duties range from intervening in resident fights to escorting residents to class.

Plaintiff served as the JDC training coordinator. He trained new officers on safety-related activities, including: accident and injury prevention; child abuse, neglect and exploitation reporting; crisis management and intervention; emergency and safety procedures; facility policies and procedures; first aid, including rescue breathing; health, sanitation, and safety measures; job duties and responsibilities; juvenile rights; observation of symptoms of illness and communicable diseases; policies regarding behavior management, use of restraints, and crisis intervention; and suicide prevention. Plaintiff also provided or coordinated 40 hours of annual in-service training for experienced officers on similar subjects. He directly advised officers regarding interactions with residents. Plaintiff supervised officers on the detention center floor on some nights and weekends. He also had personal contact with residents upon their

admission to the JDC during the "classification" process. He further served as a hearing officer on disciplinary tickets issued to residents.

## A. The UG Substance Abuse Policy

UG maintains a substance abuse policy ("SAP") that includes random drug testing of employees in "safety sensitive" positions. (Dkt. 35-2, at 9). The SAP lists certain job functions that qualify a position as "safety sensitive" if performed regularly, including "[m]onitoring or supervising offenders or detainees in the criminal justice system, both juveniles and adults . . . ." (Dkt. 35-2, at 15). The SAP specifies that the Sheriff's Department positions of "juvenile detention officer" and "juvenile lieutenant" at the JDC are "safety sensitive" positions. (Dkt. 35-2, at 40).

Random drug testing is conducted by collecting and testing urine samples that are divided into two bottles: Bottle A and Bottle B. Testing is performed on Bottle A. By reference to 49 C.F.R. 40, the SAP defines a positive cocaine test as the presence of cocaine metabolites at concentrations of 150 ng/mL on initial test and 100 ng/mL upon a confirmatory test. Positive test results are confirmed by a medical review officer ("MRO"). After a positive drug test, an employee may make a request to the MRO that Bottle B be tested by a separate laboratory.

The SAP specifies that "[a]n employee who is tested under the provisions of this policy and who has a positive test result for drugs . . . is subject to discipline including discharge." (Dkt. 35-2, at 30). Under the SAP, "[a]ction to discipline an employee must be taken in accordance with the Human Resources Guide or applicable bargaining agreement." *Id.*

The Human Resources Guide ("HRG") suggests suspension upon a first offense for "[p]ossession, use or being under the influence of an intoxicant or drug while on duty." (Dkt. 35-2, at 45-47). The HRG also specifies that "[a] more severe penalty than indicated may be imposed if warranted by the circumstances." (Dkt. 35-2, at 45). Under the HRG, penalties are left "to be determined by the circumstances" for violations of department rules or regulations and violation of safety rules. (Dkt. 35-2, at 46).

**B. Plaintiff's Positive Drug Test, Termination, and Grievance**

On March 7, 2012, plaintiff supplied a urine sample pursuant to the SAP's random drug testing program. In accord with the SAP, the sample was divided into Bottles A and B. Bottle A was submitted to Quest Diagnostics for testing. On March 15, 2012, Quest reported to the MRO, Gregory Bono, M.D., that plaintiff had tested positive for cocaine. The same day, Dr. Bono notified Renee Ramirez, the administrator of the UG's drug and alcohol testing program, of the positive test result. Ramirez notified Sheriff Ash. Sheriff Ash, Ramirez, and Broadus met with plaintiff that afternoon and informed him of the positive test. Plaintiff asked to have Bottle B tested by a different laboratory, Clinical Reference Laboratory. They obliged, and Bottle B also tested positive for cocaine metabolites. On or about March 20, 2012, Sheriff Ash terminated plaintiff's employment for violating the SAP.

On March 22, 2012, plaintiff filed a grievance regarding his termination under the UG's grievance procedure. Broadus and Sheriff Ash denied the grievance, and plaintiff appealed that denial to the County Administrator. On April 24, 2012, Ortiz presided over the appeal hearing, at which plaintiff was represented by counsel. On May 8, 2012,

4

plaintiff's counsel emailed documentation to Ortiz purporting to be results of a hair sample drug test performed by Omega Laboratories on April 24, 2012. The Omega test reported negative for cocaine metabolites above a cut-off level of 500pg/mg. In a memorandum to defendant Bach dated May 14, 2012, Ortiz reported his findings of fact and recommended that plaintiff's termination be upheld. In a letter dated May 15, 2012, Bach informed plaintiff that his grievance was denied.

## II. Summary Judgment Legal Standard

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A factual dispute is material if it "might affect the outcome of the suit . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). If the moving party carries its burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the non-moving party to show "that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990) (citing *Celotex*, 477 U.S. at 324).

5

The non-moving party may not rely upon mere allegations or denials in its pleadings or briefs, but must present specific facts showing the presence of a genuine issue of material fact for trial. *Liberty Lobby*, 477 U.S. at 256. Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Id.* at 249–50. The non-moving party must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The court must determine "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. "In making such a determination, the court should not weigh the evidence or credibility of witnesses." *Wells v. Wal-Mart Stores, Inc.*, 219 F. Supp. 2d 1197, 1200 (D. Kan. 2002). The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

## III. Analysis

### A. Sheriff Ash and the UG are granted summary judgment on plaintiff's Fourth Amendment claim.

Plaintiff claims that defendants Ash and the UG subjected him to an unlawful search by demanding that he submit urine samples for drug testing.

<u>1. Sheriff Ash is entitled to qualified immunity on plaintiff's Fourth Amendment claim.</u>

Sheriff Ash asserts a qualified immunity defense to the Fourth Amendment claim, which requires the court to use an atypical summary judgment analysis. "When a

defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The court must evaluate whether a constitutional right was violated by considering the facts alleged "in the light most favorable to the party asserting the injury." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The court has discretion to address the two prongs in any order. *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (internal citation omitted).

*a. Sheriff Ash did not violate a constitutional right by demanding urine drug tests.*

The Fourth Amendment protects individuals from unreasonable government searches. U.S. CONST. amend IV. State-compelled collection of urine samples for drug testing is a search under the Fourth Amendment. *Skinner v. Railway Labor Exec.'s Ass'n*, 489 U.S. 602, 618 (1989). A search is generally considered reasonable "only if it is supported by a warrant issued on probable cause." *Saavedra v. City of Albuquerque*, 73 F.3d 1525, 1531 (10th Cir. 1996). The Supreme Court has recognized an exception to this rule "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Skinner*, 489 U.S. at 619 (internal quotation and citation omitted). A "special needs" search is constitutional

7

under the Fourth Amendment's reasonableness requirement if the governmental interest outweighs the individual privacy interest in the particular context in which the search took place *Id.*; *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665-66 (1989).

When determining whether a "special needs" exception applies, the court must first evaluate whether plaintiff had a reasonable expectation of privacy, then balance that expectation against the governmental interest to determine whether the intrusion was reasonable. *See City of Ontario, Cal. v. Quon*, 560 U.S. 746, 756-68 (2010).

An individual has a protected privacy interest in the collection and testing of his urine. *See Skinner*, 489 U.S. at 617. However, "it is plain that certain forms of public employment may diminish privacy expectations even with respect to such personal searches." *Von Raab*, 489 U.S. at 671 (noting that employees of the "[U.S.] Mint, for example, should expect to be subject to certain routine personal searches when they leave the workplace every day"). Certain "operational realities of the workplace" may also diminish the employee's privacy expectation. *Id.* at 671-72 (Customs employees directly involved in drug interdiction or who carry firearms have a diminished expectation of privacy regarding a urine drug test). Official policies can also diminish the employee's expectation of privacy. *See Quon*, 560 U.S. at 758 (evaluating the City's Computer Policy clearly stating no expectation of privacy when using City computers in expectation of privacy analysis).

Here, plaintiff is employed as a supervisory lieutenant in a juvenile correction facility. The facility houses individuals who are charged with crimes, may be involved in drug activities, and may engage in violence within the facility at any time. Plaintiff's

8

duties, even if administrative, may involve direct contact with or interdiction of illegal drugs or improvised weapons within the facility. Plaintiff performs a supervisory, and sometimes direct, role in the safety and educational development of residents. His success in the role of supervisor, trainer, and advisor depends uniquely on his judgment and ability to reason clearly. Information gathered from a urine drug test bears directly on his fitness to perform those functions. Further, the UG's SAP specifies that lieutenants employed by the Sheriff's Department at the JDC are subject to random urine drug testing. The circumstances of plaintiff's job diminish his expectation of privacy regarding urine drug testing.

His diminished expectation of privacy must be balanced against the government's interest in ensuring that he does not use illegal drugs.

The operation of "a government office, school, or prison . . . presents special needs beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." *Skinner*, 489 U.S. at 620. The detention center is both a school and a jail, and thus presents such "special needs." It houses troubled youths ranging in age from 10 to 17. Many may be susceptible to illegal drug use. They are young and impressionable and may be able to alter their future path in a positive manner if kept isolated from the perils of illegal drugs. Drug testing individuals who operate the JDC is important to ensure that they can provide residents a safe environment and serve as unimpaired role models. Further, drug testing helps prevent any drug use or trafficking within the JDC that may be facilitated by a JDC

lieutenant working in an administrative, supervisory, or direct-contact role within the facility.

The state has "undertaken a special responsibility of care and direction" for these youths. *Bd. of Educ. of Ind. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 834 (2002) (quoting *Veronia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 662 (1995)). The governmental interest in ensuring that plaintiff and others in his position abstain from illegal drug activity is great and outweighs plaintiff's diminished privacy interest in the collection and testing of his urine. The search was reasonable; Sheriff Ash did not violate a constitutional right by demanding random urine samples for drug testing. [1]

Plaintiff thus fails to overcome the qualified immunity defense by proving a violation of a constitutional right that was well-established. Sheriff Ash is therefore entitled to qualified immunity on plaintiff's Fourth Amendment claim.

## 2. The UG did not violate the Fourth Amendment.

"[None] of our cases authorize[] the award of damages against a municipal corporation based on the actions of one of its officers when in fact . . . the officer inflicted no constitutional harm." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1322 (10th Cir. 2009) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Where plaintiff's claims fail against the officer, they also fail against the municipality. *Id.*

---

[1] Suspicionless urine drug screening has been found reasonable under the special needs exception for: railroad employees engaged in train operations to protect public safety, *Skinner*, 489 U.S. 602; student athletes to prevent drug use in public schools, *Veronia*, 515 U.S. 646; and federal customs agents who carry arms or are involved in drug interdiction, *see Von Raab*, 489 U.S. 656.

Therefore, no genuine issue remains for trial: summary judgment is proper in favor of the UG because Sheriff Ash did not violate the Fourth Amendment.

**B. Defendants are entitled to summary judgment on plaintiff's due process claims.**

Plaintiff alleges that all defendants violated his substantive and procedural due process rights. The individual defendants assert a qualified immunity defense.

1. Defendants Ash, Broadus, Ortiz, and Bach did not violate plaintiff's due process rights.

"The Due Process Clause of the Fourteenth Amendment ensures that one cannot be deprived of a property right absent due process of law." *Potts v. Davis Cnty.*, 551 F.3d 1188, 1192 (10th Cir. 2009). A protected property right is prerequisite to either a substantive or procedural due process claim concerning employment. *Id.* "In the employment context, a property interest is a legitimate expectation in continued employment." *Hesse v. Town of Jackson, Wyo.*, 541 F.3d 1240, 1245 (10th Cir. 2008). The court looks to state law to determine whether such an interest exists for an employee of that state. *See id.*

Under Kansas law, a property interest in public employment exists only where tenure for the office is established by the constitution, statute, ordinance, contract, or implied contract. *Stoldt v. City of Toronto*, 678 P.2d 153, 160 (Kan. 1984). A Kansas sheriff may "appoint, promote, demote, and *dismiss* additional deputies and assistants necessary to carry out the duties of the office . . . ." K.S.A. § 19-805(a) (emphasis added); *see also Owens v. Rush*, 654 F.2d 1370, 1376 (10th Cir. 1981) (county sheriff "has plenary power of appointment and removal"). Kansas sheriff's department employees thus

have no tenure expectation derived from the state constitution, statute, or ordinance. Plaintiff does not allege a contractual guarantee to tenure, but does allege such guarantee by implied contract.

> *a. Plaintiff does not have a protected property interest created by implied contract.*

Under Kansas law, "an employee hired for an indefinite term is an 'at-will employee' without a property interest." *USD No. 457 v. Phifer*, 729 F. Supp. 1298, 1303 (D. Kan. 1990) (quoting *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir. 1988)). However, an implied contract for a definite period of time might establish a protected property interest. *Farthing v. City of Shawnee, Kan.*, 39 F.3d 1131, 1138 (10th Cir. 1994). Personnel policy manuals alone are insufficient to create an implied employment contract under Kansas law. *Id.*; *Conaway*, 853 F.2d at 794. Although the existence of an implied contract under Kansas law is "normally a factual issue heavily dependent on the intent of the parties," the district court may rule on the issue in summary judgment if the facts presented are insufficient to survive the motion. *Farthing*, 39 F.3d at 1138.

Plaintiff argues that the combination of K.S.A. § 19-805(d), the UG Grievance Procedure and HRG, and his employer's course of conduct together create an implied employment contract that employment will continue until terminated under the HRG. According to plaintiff, the HRG indicates an expectation of continued employment, rather than dismissal, for a first positive drug test. However, the HRG does not provide a *definite term of employment* for plaintiff or anyone in his situation. The sections of the HRG referenced by plaintiff indicate when an employee can be terminated for positive drug tests. The event of an employee testing positive for drugs is anything but definite –

it may never happen. Thus, the HRG does not indicate a definite term of employment. Rather, within a "protected property interest" analysis, plaintiff's argument is self-defeating because it proposes an implied contract to continue at-will employment, which has no protected property interest under Kansas law. Thus, even if an implied employment contract existed, it would not support plaintiff's due process claim.

Plaintiff fails to identify any statute, policy, course of conduct, or other evidence indicating an implied contract establishing a definite term of tenure.  He fails to establish that he has a protected property interest in his employment with the UG, and thus fails to show that the individual defendants violated a due process right. Defendants Ash, Bach, Broadus, and Ortiz are entitled to qualified immunity on plaintiff's due process claims.

In the absence of a constitutional violation by the individual defendants, plaintiff cannot prevail against the UG on his due process claim. No genuine issue of material fact remains for trial. Accordingly, summary judgment is granted in favor of all defendants on plaintiff's due process claims.

## C. Plaintiff is not entitled to a name-clearing hearing.

The implication of a liberty interest is prerequisite to entitlement to a name-clearing hearing based on a due process violation. *See Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir. 1994); *McDonald v. Wise*, 769 F.3d 1202, 1212 (10th Cir. 2014). Here, the pretrial order does not include a claim that a liberty interest was damaged. The pretrial order supersedes all pleadings and controls the litigation. FED. R. CIV. P. 16(d), (e); D. KAN. R. 16.2(c). Plaintiff is thus not entitled to a name-clearing hearing.

**D. The UG did not breach an implied employment contract.**

Plaintiff claims that the UG breached an implied contract by terminating him for a first positive drug test, rather than suspending him. As in his due process argument, plaintiff argues that the combination of K.S.A. § 19-805(d), the UG Grievance Procedure and HRG, and his employer's course of conduct together create an implied employment contract that plaintiff will not be terminated for a first positive drug test. The court disagrees.

Section 19-805(d) requires that personnel actions taken by the sheriff under § 19-805 shall be subject to the county's personnel policies and procedures – here, the HRG and SAP. Plaintiff relies heavily on the HRG's suggestion of suspension for a first offense of a drug violation. However, the HRG specifies that a more severe penalty may apply depending on the circumstances and that violations of safety rules are "to be determined by the circumstances." The SAP drug testing program is a safety rule because it specifically applies only to "safety sensitive" positions. The HRG thus indicates that penalties for violating the SAP are to be determined by the circumstances; it does not indicate a guarantee of suspension rather than dismissal for a first offense.

Further, the SAP specifies that those who supervise offenders or who are lieutenants at the JDC are subject to the SAP. Plaintiff is a lieutenant who serves in a supervisory capacity at the facility and is thus subject to the SAP; no reasonable jury would conclude otherwise. The SAP specifies that a positive drug test may result in dismissal. The SAP therefore does not indicate a guarantee of suspension rather than dismissal for a first offense.

Finally, the UG's course of conduct does not guarantee suspension for a first positive drug test. Seven out of nineteen total positive drug tests between 2009 and 2014 resulted in either dismissal or resignation in lieu of dismissal. (Dkt. 42-3). Plaintiff is employed by Sheriff Ash. K.S.A. § 19-805. Plaintiff's Exhibit A in support of his brief shows that all four Sheriff's Department employees who tested positive for drugs during that time were either dismissed or given the option to resign. (Dkt. 42-3). The undisputed facts indicate that Sheriff Ash exercises a "zero tolerance" policy within the department. Therefore, the relevant course of conduct indicates that Sheriff's Department employees will be dismissed, not suspended, after a first positive drug test.

Section 19-805(d), the UG's policies, and Sheriff Ash's course of conduct neither individually, nor in the aggregate, evince an intent to guarantee suspension, rather than dismissal, of JDC lieutenants for a first positive drug test. Instead, the undisputed facts demonstrate that the Sheriff can impose greater penalties, including dismissal, at his discretion regarding positive drug tests for JDC lieutenants. No reasonable jury would find that an implied employment contract required the UG to suspend plaintiff for his first positive drug test. Accordingly, the UG is entitled to summary judgment on plaintiff's breach of contract claim.

IT IS ACCORDINGLY ORDERED this 23rd day of July 2015, that defendants' Motion for Summary Judgment (Dkt. 34) is GRANTED.

s\ J. Thomas Marten
J. THOMAS MARTEN, JUDGE